# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

№ 02-CV-5988 (JFB) (VVP)

———————————

ELISE MORRIS AND DOUGLAS KATSAROS,

Plaintiffs,

VERSUS

HERBERT FLAIG AND MARILYN FLAIG,

Defendants.

———————————

MEMORANDUM AND ORDER
March 31, 2007

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Elise Morris ("Morris") and Douglas Katsaros ("Katsaros") (collectively "plaintiffs") bring the instant action against their former landlords, defendants Herbert Flaig and Marilyn Flaig (collectively, "defendants"), alleging state claims, as well as a violation of the federal Residential Lead-Based Paint Hazard Reduction Act ("RLPHRA"), arising from a lead-paint condition in their Brooklyn residence. In particular, plaintiffs' lawsuit focuses on their assertion that, while they were tenants in a four-story Brooklyn brownstone, the defendant landlords allowed a serious lead-paint condition to exist in the residence for many years. Defendants deny any knowledge of the condition until 2002, when plaintiffs had the residence tested and high levels of lead paint were discovered, at which time defendants sought to remedy the condition.

Despite the landlords' efforts, lead paint was again discovered at the residence in 2003. Plaintiffs alleged that their young daughter's diagnosis of pervasive developmental disorder was caused by the lead-paint condition and sought, among other things, recovery for intentional infliction of emotional distress for their concern over their daughter's impairment as a result of defendants' alleged conduct in allowing the lead-paint condition to persist.

A jury trial took place from May 15, 2006 through May 30, 2006, when the jury (1) found defendants liable for the plaintiffs' claims of negligence and breach of the implied warranty of habitability; and (2) declined to find defendants liable as to plaintiffs' federal claim under the RLPHRA, as well as plaintiffs' claims for gross negligence, intentional infliction of emotion distress, intentional misrepresentation, and

negligent misrepresentation. With respect to damages, the jury awarded $5,268 in compensatory damages (for out-of-pocket expenses when plaintiffs vacated the residence for several weeks in July 2002 during the lead paint remediation) and $110,000 in punitive damages against defendant Herbert Flaig in connection with his breach of the implied warranty of habitability.

Presently before the Court are post-trial motions brought by both parties. Plaintiffs move for partial judgment notwithstanding the verdict under Rules 50 and 59 of the Federal Rules of Civil Procedure, to the extent of (1) granting a new trial on the issue of the rent abatement due to plaintiffs; and (2) entering judgment as a matter of law on the federal RLPHRA claim and (3) granting a new trial on RLPHRA damages. Plaintiffs also seek attorneys fees, costs, and disbursements under the RLPHRA or, alternatively, under N.Y. Real Prop. Law § 234. Defendants move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) setting aside the punitive damages award or, alternatively, for *remittitur* or amendment of the judgment as to the amount of punitive damages, pursuant to Fed. R. Civ. P. 59. For the reasons that follow, (1) plaintiffs' Rule 50(b) and Rule 59(a) motions are denied in their entirety, and (2) defendants' Rule 50(b) motion to set aside the punitive damages award in its entirety is denied, but defendants' Rule 59 motion for *remittitur* on the punitive damages is granted.

I. BACKGROUND

A. Facts

Defendants Herbert and Marilyn Flaig owned and resided in a brownstone building in Brooklyn, New York (hereinafter, "the residence" or "the premises"), that they had purchased in 1971. (Tr. 133, 643-44.) From 1995 to 2002, they rented the property to plaintiffs Elise Morris and Douglas Katsaros. (Tr. 137, 144.) Herb Flaig represented to plaintiffs that there was no problem with the existing paint, and assured Morris that he had raised his own family in the residence. (Tr. 135-36, 168-69, 170.) The parties entered into a lease agreement on July 14, 1995, for a term of one year from September 1, 1995 through August 31, 1996, and renewed the lease the following year. (Tr. 137, 140-41; Pls. Ex. B.) Soon after moving into the building, Morris gave birth to a daughter, Kati Katsaros. (Tr. 187.) During August 1997, Mr. Katsaros' three-year-old daughter, Zoe Katsaros, came to live with plaintiffs. (Tr. 284.) Defendants were aware of the presence of both children at the residence. (Tr. 187, 340.)

In June 2002, plaintiffs became concerned about the presence of lead paint at the premises due to peeling paint on the walls. (Tr. 206.) Plaintiffs purchased a kit for lead-based paint testing, and the walls of the premises tested positive for the presence of lead. (Tr. 206-07.) They informed defendants about the results of the test, and defendants paid for professional testing to be performed. (Tr. 207-11.) On July 8, 2002, the premises were inspected for lead and the results were again positive. (Tr. 211; Pls.' Ex. AA.) The levels of lead-based paint detected at the premises were thirty to forty times beyond "acceptable" levels for lead-based paint as set by the Environmental Protection Agency ("EPA") and the U.S. Department of Housing and Urban Development ("HUD"). (Pls.' Exs. AA, BB.) When the plaintiffs learned of the positive results, they vacated the premises on July 12, 2002. (Tr. 217-218.) Defendants paid for the abatement of the lead paint, whereby the peeling paint was scraped from

the ceiling and a sealant was applied over portions of the wood molding. (Tr. 219, 227.) At the end of July, plaintiffs were informed that the work had been completed and that they could return to the residence. (Tr. 226.) At the beginning of August, the plaintiffs resumed living at the residence. (Tr. 229.) In January 2003, they learned that the ground floor apartment had tested positive for lead paint, despite previous assurances to plaintiffs that it was "fine." (Tr. 229-30; Pls.' Ex. FF.) Subsequently, Morris also discovered that areas that were the subject of the 2002 lead paint abatement had not been repaired. (Tr. 231-33.)

Prior to this time, in 1997, plaintiffs had begun to visit a therapist, and their daughter, Kati, was evaluated by a clinical professor of pediatrics.[1] (Tr. 192-93, 199, 205, 274, 284.) Kati was diagnosed with symptoms of pervasive developmental disorder. (Tr. 205, 274.) As a result, Morris experienced depression and anxiety about her daughter's condition. (Tr. 214-16.) Morris was treated with therapy and medication. (Tr. 284-87, 575-85.) However, after learning of the positive results of the lead kit, Morris became concerned that lead-based paint may have caused her daughter's condition. (Tr. 214-16, 590.) Her depression and anxiety increased and she sought further medical services. (Tr. 305, 622-23.)

B. Procedural History

On November 12, 2002, plaintiffs filed the instant action. In their amended complaint, filed on April 8, 2003, plaintiffs asserted eleven causes of action: (1) breach of implied warranty of habitability, (2) constructive eviction, (3) negligence, (4) gross negligence, (5) intentional infliction of emotional distress, (6) negligent infliction of emotional distress, (7) violation of New York City's Local Law 1, (8) nuisance, (9) intentional/fraudulent misrepresentation, (10) negligent misrepresentation, and (11) violation of the RLPHRA, 42 U.S.C. §§ 4851-56. Plaintiffs sought relief in the form of rent abatement, compensatory damages, punitive damages, and treble damages under the RLPHRA.

On February 27, 2004, defendants moved for summary judgment as to all claims, and plaintiff cross-moved for partial summary judgment on March 2, 2004. On July 29, 2005, Magistrate Judge Viktor V. Pohorelsky issued a Report and Recommendation granting in part and denying in part defendants' motion for summary judgment. Specifically, plaintiffs' claims of constructive eviction, negligent infliction of emotional distress, and nuisance were dismissed. The Honorable John Gleeson adopted the Report and Recommendation in full on October 3, 2005.

This case was reassigned to the undersigned on February 10, 2006. From May 15, 2006 through May 30, 2006, a jury trial was held before this Court on the remaining claims. On May 25, 2006, the jury found in favor of the plaintiffs as to their claims for breach of the implied warranty of habitability and negligence, and awarded $5,268.01 in compensatory damages against both defendants. (Court Ex. 5.) The jury declined to award rent abatement to plaintiffs. (Court Ex. 5.) The jury also determined that punitive damages were warranted against defendants. (Court Ex. 5.) After further deliberation, the jury awarded $110,000 in

---

[1] Morris and Katsaros' daughter, Kati, is not a plaintiff in this action and the jury did not consider any claims relating to the daughter or her condition.

punitive damages against defendant Herbert Flaig. (Court Ex. 6.)

On July 21, 2006, both parties filed post-trial motions. Defendants moved for judgment as a matter of law notwithstanding the verdict pursuant to Fed. R. Civ. P. 50(b) and for *remittitur* or amendment of the judgment pursuant to Fed. R. Civ. P. 59 as to punitive damages against the defendants. Plaintiffs moved under Fed. R. Civ. P. 59 to set aside the jury verdict and to hold a new trial regarding rent abatement. Plaintiffs also moved under Fed. R. Civ. P. 50(b) for judgment as a matter of law notwithstanding the verdict regarding plaintiffs' RLPHRA claim, and for a new trial on statutory damages. In addition, plaintiffs seek costs, treble damages, and attorneys' fees pursuant to the RLPHRA. Oral argument was held on September 13, 2006, where the Court considered ordering a new trial, pursuant to Fed. R. Civ. P. 59(d) on the basis of inconsistency in the jury verdict. Following oral argument, both parties submitted supplemental briefing to address whether a new trial should be held pursuant to Rule 59(d).

## II. DISCUSSION

### A. Rule 50(b) Motions for Judgment as a Matter of Law

#### 1. Standard of Review

The standard governing motions for judgment as a matter of law (formerly described as motions for directed verdict) pursuant to Rule 50 is well-settled. Judgment as a matter of law may not properly be granted under Rule 50 against a party "unless the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to

permit a reasonable juror to find in his favor." *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007) (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)). In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it "may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001) (quoting *Galdieri-Abrosini*, 136 F.3d at 289). Thus, judgment as a matter of law should not be granted unless

(1) [T]here is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
(2) [T]here is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Advance Pharm., Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004) (quoting *Galdieri-Ambrosini*, 136 F.3d at 289) (internal citations omitted).

#### 2. Judgment as a Matter of Law as to Punitive Damages

##### (a) Public Aim Requirement

Defendants now move, under Rule 50(b), to set aside the jury's entry of punitive damages for breach of the warranty of habitability against defendant Herbert Flaig. Defendants argue that New York law requires that for punitive damages to attach to a breach of contract claim, the conduct of the defendant must have targeted the public generally. In

*TVT Records v. Island Def Jam Music Group*, 412 F.3d 82 (2d Cir. 2005), the Second Circuit examined the landscape of New York law, and while it noted that some Appellate Division cases had permitted punitive damages in ordinary contract breach cases without a finding that the breach had targeted the public generally, the most recent New York Court of Appeals decisions called that principle into question:

> In *Rocanova v. Equitable Life Assurance Soc'y of the U.S.*, 634 N.E.2d 940 (1994), the Court of Appeals, after reviewing . . . precedent, concluded that "punitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights," but that such damages were recoverable when the breach also involved a particularly egregious fraud that "was aimed at the public generally." *Id.* at 943 (internal quotation marks omitted). In *N.Y. Univ. v. Cont'l Casualty Ins. Co.*, 662 N.E.2d 763 (1995), decided the following year, the Court of Appeals made it even more clear that punitive damages were recoverable in a contract action only "if necessary to vindicate a public right." *Id.* at 767 (citing *Rocanova*, 634 N.E.2d at 943). This rule has not been changed by the Court of Appeals, and we have no reason to question its continued vitality.

*TVT Records*, 412 F.3d at 94 (footnote omitted). The Court of Appeals rejected the possibility of an exception to the public aim requirement where the plaintiff establishes a sufficiently high degree of bad faith, finding that the Appellate Division cases that formed the basis of that argued-for exception did not address the issue of the public aim requirement, and "were decided at a time when New York law was at best ambiguous as to whether conduct directed at the general public was necessary to recover for breach of contract." *Id.* (citations omitted).

The application of the public aim requirement was considered and rejected by the Magistrate Judge in his Report & Recommendation addressing defendants' motion for summary judgment. According to the Report & Recommendation:

> The defendants' motion for summary judgment regarding the plaintiffs' claim requesting punitive damages fails. Conduct which justifies the award of punitive damages is that which is determined to have a high degree of moral culpability. *Home Ins. Co. v. Am. Home Prod. Corp.*, 75 N.Y.2d 196, 203 (1990). This standard remains regardless of whether the harm was aimed at the public generally or private individuals. *Giblin v. Murphy*, 73 N.Y.2d 769, 772 (1988).

Report & Recommendation, at 26-27.[2]

As a threshold matter, plaintiffs argue that defendants should be prohibited from arguing the applicability of the public aim requirement because it was expressly rejected by the Magistrate Judge, and it thus has become the "law of the case." "The law of the case doctrine 'posits that when a court decides

---

[2] As stated *supra*, the Report and Recommendation was adopted by District Judge Gleeson in its entirety.

upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 7-8 (2d Cir. 1996) (quoting *DiLaura v. Power Auth.*, 982 F.2d 73, 76 (2d Cir. 1992)) (internal citation omitted). However, the doctrine is "admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citing *Arizona v. California*, 460 U.S. 605, 618 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power.") (additional citations omitted). "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Id.* (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 at 790) (additional citation omitted).

Plaintiffs argue that there is no justification for departing from the law of the case doctrine because there was no intervening change of controlling law — assuming that *TVT Records* constituted such a change,[3] it was available for consideration at

the time that the Magistrate Judge decided the motion for summary judgment — *TVT Records* was issued less than two months previous to that date, and the parties merely failed to cite it to the Court. However, while this is true, the Court may still reconsider the decision if it believes that the prior decision was in "clear error." *See Virgin Atl. Airways*, 956 F.2d at 1255.

The Second Circuit is unlikely to agree with the broad proposition set forth in the Report & Recommendations — that the public aim requirement is not a prerequisite to punitive damages in ordinary contract cases — given its opinion in *TVT Records*. The case relied upon by the Magistrate Judge — *Giblin v. Murphy* — did not address the public aim requirement, and simply stated that a punitive damages award was available for claims of breach of fiduciary duty and fraudulent inducement to contract, "so long as the very high threshold of moral culpability is satisfied." *Giblin*, 532 N.E.2d 1282, 1284 (N.Y. 1988) (citations omitted). *Giblin* was cited by the lower court in *TVT Records* in support of its proposition that the public aim requirement was inapplicable, *see TVT Records v. Island Def Jam Music Group*, 262 F. Supp. 2d 188, 199 (S.D.N.Y. 2003), and was thus at least implicitly rejected by the Second Circuit when it reversed the decision. *See also ConocoPhillips v. 261 E. Merrick Rd. Corp.*, 428 F. Supp. 2d 111, 129 (E.D.N.Y. 2006) (noting that punitive damages were not

---

[3]Plaintiffs argue that *TVT Records* does not constitute a change in controlling law because the New York Court of Appeals, and not the Second Circuit "has the final word on the meaning of state law." *Deeper Life Christian Fellowship, Inc., v. Sobol*, 948 F.2d 79, 84 (2d Cir. 1991) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938) (noting that the Constitution did not confer upon federal courts the authority to "declare substantive rules of common law applicable in a State")). Although it is true that the New York Court of Appeals is the final authority regarding this issue of New York law, the Second Circuit's decision in *TVT*

*Records* remains the controlling precedent upon this Court regarding the interpretation of New York Court of Appeals decisions opining on this issue, including *Rocanova* and *Giblin*. Since the New York Court of Appeals has not spoken to the issue since *TVT Records*, this Court is bound by the interpretation of the law provided by *TVT Records*.

available absent satisfaction of the public aim requirement, rejecting plaintiffs' reliance on *Giblin*, noting that it proceeded *Rocanova*, and noting that *TVT Records* expressly rejected the proposition that *Rocanova* permits a narrow exception to the public aim requirement where a defendant's conduct evinced a particularly high degree of bad faith).

However, despite this general rule, the Court finds that punitive damages are permitted for particularly egregious breaches of the implied warranty of habitability, New York Real Property Law § 235-b, whether or not the breach directly targets the public, because claims brought under that provision seek to enforce important *public* rights to safe and appropriate housing.[4] *Rocanova* noted

that its limitation on punitive damages applies to "ordinary" breach of contract claims, 634 N.E.2d at 943, and that is where the rule has been consistently applied – where one party sues another for breach of particular obligations specifically provided for in a privately negotiated agreement. *See, e.g., Rocanova*, 634 N.E.2d at 944-45 (alleging unfair settlement practices under insurance contracts); *see also N.Y. Univ.*, 662 N.E.2d at 769-70 (alleging breach of contract based upon insurance carrier's failure to pay claim and renew policy); *TVT Records*, 412 F.3d at 87, 93-96 (alleging breach of promotion and royalties contract between recording companies). These standard sorts of breach of contract claims necessarily involve only the private rights of the parties to the lawsuit, the parties which negotiated the contract at issue. *Rocanova* and *New York University* both noted that punitive damages should only be available where they are necessary to "vindicate public rights," and in regular private contracts, the only time that generally occurs is where the alleged breach of contract targets the public. *See, e.g., Skinbinsky v. State Farm Fire & Cas. Co.*, 775 N.Y.S.2d 200, 202 (N.Y. App. Div. 2004) (finding that punitive damages were available where insurance company defendant committed alleged pattern of deceptive conduct by selling lesser policies than those requested by members of the public while representing that the desired coverage had been provided, and distinguishing *New York University* as involving a "purely private dispute between a

---

[4] Alternatively, plaintiffs argue that "even if a showing of conduct directed at the public is required," defendants are liable under such a standard because they repeatedly rented out the defective premises, thereby endangering "two other families with children, two college professors, and another individual . . . as well as any guests who came to their homes during their tenancy." (Pls.' Opp. Br., at 30, n.4.) Defendants counter that "Herb Flaig was a college history professor/administrator renting out his own home, and not a 'professional landlord.'" (Defs.' Br., at 18 n.19) (citing Tr. 632, 647, 648, 645, 646); (*see also* Defs' Reply Br., at 10 ("Defendants privately rented out their home to plaintiffs. They were not professional landlords or real estate developers.").) The Court agrees with plaintiffs, but believes that other evidence on this issue is more compelling. A review of the trial record supports the conclusion that evidence regarding certain conduct of the defendants could be shown to have been directed at the public generally. For instance, defendants' conduct in removing the fire sprinkler system, instructing tenants not to admit government inspectors, and failing to properly register the building all had an impact on the

---

public at large. These acts are distinguishable from situations where a landlord's acts, such as a failure to provide hot water or heating, have an effect solely upon the tenant. Therefore, even if there is such a public aim requirement on the part of defendants, the requirement has been met in the instant case.

major university and its insurance company over a complex policy which had been tailored to meet the specific needs of the university").

Although claims for breach of the implied warranty of habitability sound in contract,[5] they are dramatically different from standard breach of contract claims arising from breach of privately negotiated agreements. The rights implied into all rental agreements in New York under RPL §235-b are non-waivable,[6] and directly address concerns of health and public safety, and deterring landlords from committing egregious violations of the implied warranty of habitability directly serves the public interest. *Minjak Co. v. Randolph*, 528 N.Y.S.2d 554, 558 (N.Y. App. Div. 1988) ("With respect to this State's strict housing code standards and statutes, made enforceable through civil and criminal sanctions and other statutory remedies, it is within the public interest to deter conduct which undermines those standards when that conduct rises to the level of high moral culpability or indifference to a landlord's civil obligations. Therefore, it has been recognized that punitive damages may be awarded in breach of warranty of habitability cases where the landlord's actions or inactions were intentional and malicious.") (citations omitted). Indeed, a number of New York courts have historically permitted punitive damages for wanton violations of the implied warranty of habitability. *German*, 885 F. Supp. at 568 ("Since [*Park West Mgmt. Corp. v. Mitchell*, 404 N.Y.S.2d 115 (N.Y. App. Div. 1978), *aff'd*, 391 N.E.2d 1288 (N.Y. 1979)], New York courts have been willing to award punitive damages for particularly egregious breaches of the implied warranty of habitability.") (collecting cases)[7]; *see, e.g., Minjak Co.*, 528 N.Y.S.2d at 557-58 (upholding award of punitive damages for performing repairs without regard for tenants' safety); *Pleasant E. Assocs. v. Cabrera*, 480 N.Y.S.2d 693, 697 (N.Y. Civ. Ct. 1984) (finding punitive damages properly imposed where landlord's failure to repair severe water damage was motivated by tenants' racial differences and lack of a marital relationship); *Kipsborough Realty Corp. v. Goldbetter*, 367 N.Y.S.2d 916, 922-23 (N.Y. Civ. Ct. 1975) (awarding punitive damages where landlord wilfully and flagrantly violated Multiple Dwelling Law for three years by failing to

---

[5] *German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537, 567 (S.D.N.Y. 1995) ("It is well settled that section 235-b provides tenants with a cause of action sounding in breach of contract.") (citations omitted).

[6] N.Y. Real Prop. Law §235-b(2) provides that: "Any agreement by a lessee or tenant of a dwelling waiving or modifying his rights as set forth in this section shall be void as contrary to public policy."

---

[7] Defendants contend that, because in *German*, defendants failed to assert "that their breach of the implied warranty of habitability is not sufficiently serious and wanton to justify punitive damages" and there was no indication that punitive damages were actually litigated or awarded in that case, *German* is inapposite. (Defs.' Reply Br., at 14 & 14 n.14) (quoting *German*, 885 F. Supp. at 568 n.12). In fact, in *German*, the court considered punitive damages in the context of defendant City of New York's contention that, as a municipality, it was not subject to punitive damages. 885 F. Supp. at 567, 568. Contrary to defendants' assertions, the court's finding that punitive damages were not available does not undermine the court's acknowledgment that such relief generally has been deemed available by New York state courts in cases of "particularly egregious breaches of the implied warranty of habitability." *Id.* at 568 (footnote and additional citations omitted).

repair roof, which rendered apartment uninhabitable, noting that "[t]he antidote for scofflaw landlords may be the swift and condign imposition of compensatory and punitive damages where necessary"); *Benitez v. Restifo*, 641 N.Y.S.2d 523, 526 (N.Y. City Ct. 1996) (granting punitive damages where landlord failed to remove a problem tenant who had repeatedly caused flooding that damaged plaintiff's apartment). Likewise, in *Suffolk Sports Ctr. v. Belli Constr. Corp.*, the Appellate Division acknowledged the public aim achieved by permitting punitive damages awards in landlord-tenant cases:

> [A]lthough [the landlord]'s actions were not specifically directed at the public, nevertheless an award of punitive damages is appropriate since punitive damages are intended "not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future." [*Walker v. Sheldon*, 179 N.E.2d 497, 498 (N.Y. 1961).] Moreover . . . to allow any landlord to vitiate a landlord-tenant contract by resort to extralegal means would generally do a disservice to all tenants. Therefore, to the extent that denying a punitive damage award herein could be interpreted as tacit permission for a landlord to engage in threats and intimidation, conversely, the sanctioning of punitive damages will serve the public good by acting as a deterrent to similar actions in the future.

628 N.Y.S.2d 952, 956 (N.Y. App. Div. 1995).

These cases plainly indicate New York courts' intent to vindicate the public aims of the warranty of habitability by imposing punitive damages for particularly egregious breaches. In light of such decisions, combined with the principles set forth in *Rocanova*, this Court declines to find, as a matter of law, that the public aim requirement bars an award of punitive damages where a jury finds a breach of the warranty of habitability.

### (b) Moral Culpability Requirement

Moreover, defendants argue, there is insufficient evidence in this case to satisfy the "very high threshold of moral culpability" required for punitive damages. (Defs.' Br., at 18) (citing *Walker*, 179 N.E.2d at 498-99). Plaintiffs contend that defendants are barred from raising this argument in a Rule 50(b) motion because it was not brought up in a Rule 50(a) motion at trial. (Pls.' Opp. Br., at 13.) The Court finds that, as a matter of law, Fed. R. Civ. P. 50(b) prevents defendants from raising this argument. Fed. R. Civ. P. 50(b). The rule

> [A]llows a party to request judgment as a matter of law after the trial under Fed. R. Civ. P. 50(b) only if it sought such relief before the jury retired to deliberate under Fed. R. Civ. P. 50(a)(2), and limits the permissible scope of the later motion to those grounds "specifically raised in the prior motion for [judgment as a matter of law]."

*Provost v. City of Newburgh*, 262 F.3d 146, 161 (2d Cir. 2001) (quoting *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir. 1993) (additional citation omitted). Defendants argue that they should not be bound to this rule because the Court deferred

9

all issues related to a Rule 50(a) motion in favor of proceeding with the jury charge. (Defs.' Reply Br., at 6-7 & 6 n.6.) However, it is clear from the trial record that in defendants' Rule 50(a) motion before this Court, they raised only the argument that "the issue of punitive damages should be dismissed because the [sic] punitive damages requires [sic] a public wrong" and "[t]here is no public involvement, there are no public issues, there is no gravamen that involves the public in any way" in this action. (Tr. 780.) Because there was no mention of the argument that defendants now assert, namely that, in order for punitive damages to be awarded, "the harmful conduct must be 'intentional, malicious, outrageous, or otherwise aggravated beyond mere negligence,'" (Defs.' Br., at 18-19) (quoting *McDougland v. Garber*, 536 N.E.2d 372, 374 (N.Y. 1989)), and that the evidence presented was insufficient to establish that the conduct alleged in this case arose to such a level, it may not be properly raised on a Rule 50(b) motion.[8] Furthermore, as set forth below,

there is absolutely no basis for defendants' conclusory assertion that "hidebound application of Rule 50" would result in "manifest injustice." (Defs.' Reply Br., at 8) (citing *Doctor's Assocs. v. Weible*, 92 F.3d 108, 113 (2d Cir. 1996) (internal citations omitted)).

Moreover, plaintiffs argue, even if defendants' Rule 50(b) motion arguing a lack of moral culpability were not procedurally barred, it should be denied on the merits. According to plaintiffs, the evidence at trial demonstrates that defendants behavior was egregious as follows: (1) defendants represented to a pregnant Morris that there was no problem with the paint at the premises (Tr. 136); (2) defendants failed to repair flaking and deteriorated paint (Tr. 140-43, 158-59, 164-66, 167-68, 171-78); (3) defendant Herbert Flaig continuously represented that the paint was safe, despite visible flaking and peeling (Pls.' Exs. D1-195, E1-2, and RR), three separate lead paint reports revealing extensive areas of lead-based paint (Pls.' Exs. AA, BB, FF & YY), and violation records of the City of New York Department of Housing Preservation and Development (Pls.' Exs. NN1-2); (4) defendant Herbert Flaig illegally removed the building's sprinkler system and he ignored repeated notices from the city directing him to replace the system (Tr. 646-47, 723-24); (5) defendant Herbert Flaig failed to file sprinkler

---

[8] Inasmuch as defendants' argument regarding moral culpability implicates the verdict sheet or jury instructions, which clearly provide for an award of punitive damages if the jury finds defendants liable "on at least one of the plaintiffs' claims alleging breach of the implied warranty of habitability, gross negligence, intentional infliction of emotional distress, or intentional misrepresentation," (Tr. 1073-74), this objection has been waived because it was not made before the jury retired to deliberate. *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 57 (2d Cir. 2002) ("'[F]ailure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection. . . . Surely litigants do not get another opportunity to assign as error an allegedly incorrect charge simply because the jury's verdict comports with the trial court's instructions.'") (quoting *Lavoie v. Pac. Press &*

*Shear Co.*, 975 F.2d 48, 55 (2d Cir. 1992), and citing *Barrett v. Orange Cty. Human Rights Comm'n*, 194 F.3d 341, 349 (2d Cir. 1999) (applying Rule 51 to an objection to an instruction provided on the jury form), and *Play Time, Inc. v. LDDS Metromedia Commc'ns, Inc.*, 123 F.3d 23, 29 n.6 (1st Cir. 1997) ("The Rule 51 standard applies to the jury charge and any special verdict form.")).

safety test reports (Pls.' Exs. NN1-2); (6) Herbert Flaig failed to register the building as required by law (Pls.' Exs. NN1-2); (7) Herbert Flaig filed a certification falsely representing that he had hired a local building manager to ensure that someone was available in the event of an emergency (Tr. 718-22); (8) Herbert Flaig offered to pay plaintiffs $5,000 to leave the premises, in lieu of remedying the lead paint (Tr. 210); (9) Herbert Flaig represented that the downstairs apartment of the residence was fine, when it in fact had high levels of lead (Tr. 365); and (10) defendants instructed tenants not to admit government inspectors into the apartment in order to avoid being cited for violations, using the pretext that inspectors were merely seeking bribes (Tr. 161-63). (*See* Pls.' Opp. Br., at 4-8.) Moreover, even if the jurors only found a breach of the warranty of habitability as of July 12, 2002 (*see* Section II.C., *infra*), the jurors could have concluded that the extent of the lead paint hazard and the defendants' failure to completely remedy the problem (Tr. 226-31, 365) warranted an award of punitive damages. Viewing this evidence in the light most favorable to plaintiffs, the Court cannot find as a matter of law, under Rule 50(b), that such evidence was insufficient for a reasonable juror to conclude that defendants' actions were egregious enough to warrant punitive damages.

Therefore, defendants' motion for judgment as a matter of law to set aside the jury's award of punitive damages is denied.

### 3. Judgment as a Matter of Law On Plaintiffs' RLPHRA Claim

Plaintiffs assert that they are entitled to judgment as a matter of law notwithstanding the jury's verdict as to their claim under the RLPHRA. (Pls' Br., at 21.) Under the statute,

the lessor of any apartment is required to:

> (A) provide the purchaser or lessee with a lead hazard information pamphlet, as prescribed by the Administrator of the Environmental Protection Agency under section 406 of the Toxic Substances Control Act [15 U.S.C.A. § 2686];
> (B) disclose to the purchaser or lessee the presence of any known lead-based paint, or any known lead-based paint hazards, in such housing and provide to the purchaser or lessee any lead hazard evaluation report available to the seller or lessor; and
> (C) permit the purchaser a 10-day period (unless the parties mutually agree upon a different period of time) to conduct a risk assessment or inspection for the presence of lead-based paint hazards.

42 U.S.C. §§ 4852d(a)(1)(A)-(C); *see also* 40 C.F.R. §§ 745.107(a)(1)-(2) & (4); 40 C.F.R. § 745.110(a). In the Magistrate Judge's Report and Recommendation, he noted, "[i]t is undisputed that the defendants neither (1) provided the plaintiffs with a lead hazard information pamphlet, (2) disclosed to the plaintiffs the presence of lead-based paint at the premises, nor (3) notified the plaintiffs of their right to conduct a risk assessment for lead-based paint hazards." Report & Recommendation at 10. Under the statute, "[a]ny person who *knowingly* violates the provisions of [42 U.S.C. § 4852d] shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual." 42 U.S.C. § 4852d(b)(3) (emphasis added). Construing the knowledge requirement in this case, the Magistrate Judge explained that, "in order to impose liability on

the defendants, the first and third claims require a finding that the defendants were aware of the duty imposed on them by the regulations," while "[t]he second claim requires a finding that the defendants had knowledge, not only of the duty imposed by the regulations, but also of the existence of lead paint hazards at the premises." Report & Recommendation, at 10.

Plaintiffs contend that the sole issue at trial was "whether Defendants knew about the statute at a time when they were required to comply." (Pls.' Br., at 22.) According to plaintiffs, because defendant Herbert Flaig was aware of the statute's requirements in August 2002, at the latest, and nonetheless failed to comply with the requirements, the jury's finding for defendants on the RLPHRA claim is against the clear weight of the evidence and is "clearly erroneous." (*Id.*, at 23.) In response, defendants argue that "by the time defendants acquired any knowledge of the duties of disclosure imposed by the regulations (after August 22, 2002), the matters of disclosure were already well known to plaintiffs, and . . . it was through plaintiffs that defendants acquired such knowledge." (Defs.' Opp. Br., at 12.) Defendants assert, moreover, that a duty to provide a lessee with a lead hazard information pamphlet "only arises when a lessor has knowledge of a lead hazard in the premises *at the time of a lease commencement or renewal* and the lessor has knowledge of the requirement." (Defs.' Opp. Br., at 13.) In this case, defendants maintain, "the evidence conclusively showed, and the jury correctly found, that defendant Herbert Flaig had no knowledge of any lead hazard at the lease inception, and by the time of the lease renewal in question plaintiffs had requisite notice of the matter." (*Id.*)

The Court agrees with defendants that the

plain language of the statute requires knowledge at the time of lease commencement or renewal in order to create liability. Other courts have rejected the argument that defendants owe a "continuing duty of disclosure throughout the term of the lease," as suggested by plaintiffs' arguments. *See, e.g., Sipes ex rel. Slaughter v. Russell*, 89 F. Supp. 2d 1199, 1204 (D. Kan. 2000) (noting that 40 C.F.R. § 745.107(b) "says that disclosure must be given *before* the contract is entered into . . . [t]he only possible exception would be if [plaintiff] renewed the lease.") (emphasis in original). Lease renewals are covered by 40 C.F.R. § 745.101, which provides that

> This subpart applies to all transactions to sell or lease target housing . . . with the exception of the following . . . (d) Renewals of existing leases in target housing in which the lessor has previously disclosed all information required under § 745.107 and where no new information described in § 745.107 has come into the possession of the lessor. For the purposes of this paragraph, renewal shall include both renegotiation of existing lease terms and/or ratification of a new lease.

Thus, under 40 C.F.R. § 745.101(d), if the lease was renewed after defendants acquired knowledge of the regulations, they had a duty to disclose any information set forth in 40 C.F.R. § 745.107 *that had not already been disclosed to plaintiffs*. This standard is supported by the Final Rule promulgated by the EPA and HUD in relation to the RLPHRA:

> Therefore, the final rule identifies only the latest point at which full disclosure must occur. Using the statute as a

guide, the EPA and HUD have identified this point as before the purchaser of lessee becomes obligated under any contract to purchase or lease the housing.

61 F.R. 9064, 9070-71; *see also* Report and Recommendation, at 8 ("The regulations therefore imposed an affirmative duty on the defendants as to any renewals of the lease made after December 6, 1996) (citing 40 C.F.R. § 745.10(d)). The evidence presented at trial was that defendant Herbert Flaig learned of his obligations under the RLPHRA based upon an August 2002 letter from plaintiffs' attorney to his attorney "point[ing] out that [Flaig] had failed to comply with certain federal laws regarding the giving of certain documents and forms regarding lead disclosure." (Tr. 684.) Upon cross-examination, Flaig admitted that as a result of the letter, he learned that he had erred in "not giving out pamphlets . . . not giving out forms regarding lead disclosure." (Tr. 685.) However, according to Flaig, the plaintiffs' lease was not renewed following his receipt of the August 2002 letter, but rather there was simply an oral agreement regarding only the amount of rent going forward:

> Q. You had testified that you negotiated a new lease with Ms. Morris and Mr. Katsaros, an extension beginning August of 2002; isn't that correct?
> A. Not a new lease. Basically an extension of her staying in the apartment.
> Q. An extension of the original lease that she had entered into?
> A. That was only basically how much was the rent going to be raised, that's it.
> Q. For another year?

> A. Yes.
> Q. And after you received my letter, which is at or about the time this occurred, you still didn't give them a lead paint disclosure pamphlet; isn't that correct?
> A. That's correct.

(Tr. 685.) Plaintiffs believe this oral agreement constituted a renewal of the lease, but defendants argue that it does not.[9] Although there is no requirement that a renewal under the RLPHRA be in writing and thus this oral agreement could potentially qualify as a renewal, the jury was not required to find such a renewal existed based on the evidence and, instead, could have concluded that an oral agreement regarding rent amounts in August 2002 was not a renewal of the prior lease. In other words, based upon this testimony and the record, the jury could have concluded that there was no applicable lease renewal under the RLPHRA requiring Herbert Flaig to provide the disclosures set forth in the statute after he became aware of such obligations in August 2002.

Moreover, even if this agreement did constitute a renewal, the jury also could have reasonably found that notice to plaintiffs under the RLPHRA was satisfied at that point by the fact that their attorney, acting as their agent, made clear in August 2002 that plaintiffs were aware of the information required under the RLPHRA. (Tr. 684-85.) *See, e.g., Nunez v. J.L. Sims Co., Inc.*, No. C-020599, 2003 Ohio App. LEXIS 3075 (Ohio Ct. App. June 27, 2003) (affirming trial court's grant of summary judgment as to

---

[9] Defendants highlighted this issue to the Court in response to a note from the jury during deliberations asking for the initial lease and all additional leases. (Tr. 1104-19.)

plaintiffs' RLPHRA claim where plaintiffs were aware of the statutory requirements), *discretionary appeal denied*, 2003 Ohio LEXIS 2865 (Ohio Nov. 5, 2003).

Therefore, the Court cannot find that the evidence, viewed most favorably to the non-moving party, is insufficient to permit a jury to find in defendants' favor on plaintiffs' RLPHRA claim. Accordingly, plaintiffs' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) on the RLPHRA claim is denied. For the same reasons, plaintiffs' request for treble damages and attorneys' fees pursuant to 42 U.S.C. §§ 4852d(b)(3)-(4) is denied.

B. Plaintiffs' Motion for Attorneys' Fees Under New York Real Property Law § 234

Plaintiffs argue that, under New York Real Property Law § 234, plaintiffs are entitled to attorneys' fees as a result of having prevailed on their breach of the warranty of habitability claim. (Pls.' Br., at 23-25.) Section 234 provides that:

> Whenever a lease of residential property shall provide that in any action or summary proceeding the landlord may recover attorneys' fees and/or expenses incurred as the result of the failure of the tenant to perform any covenant or agreement contained in such lease . . . there shall be implied in such lease a covenant by the landlord to pay to the tenant the reasonable attorneys' fees and/or expenses incurred by the tenant as the result of the failure of the landlord to perform any covenant or agreement on its part to be performed under the lease . . . and an agreement that such fees and expenses may be recovered

as provided by law in an action commenced against the landlord.

N.Y. Real Prop. Law § 234. According to plaintiffs, "once it has been determined that the tenant has prevailed and the governing lease contains an attorney's fee provision, the landlord must be held liable for all of the tenant's reasonable attorney's fees." (Pls.' Br., at 24) (citing *Kumble v. Windsor Plaza Co.*, 555 N.Y.S.2d 290, 291 (N.Y. App. Div.), *appeal dismissed*, 559 N.E.2d 1285 (N.Y.), *appeal denied*, 563 N.E.2d 284 (N.Y. 1990).) Plaintiffs contend that Paragraph 15 of the lease subjects defendants to the attorneys' fees-shifting provisions of N.Y. Real Prop. Law § 234. (Pls.' Br., at 24.) Under Paragraph 15 of the lease,

> If the Lease is ended or Landlord takes back the Apartment . . . Tenant shall be responsible for Landlord's cost of re-renting. Landlord's cost shall include the cost of repairs, decorations, broker's fees, attorney's fees, advertising and preparation for renting.

(Pls.' Ex. B, ¶ 15.) The plain language of Paragraph 15, which refers to the costs of *re-renting* the apartment is plainly distinguishable from the attorneys' fees provisions referred to in the statute, which are contingent upon the parties' failure to perform any covenant or agreement related to the tenancy. The lease at issue here does not obligate tenants to pay legal fees incurred as a result of the landlord having to institute an action or summary proceeding for violations of the lease agreement; rather, the clause is expressly limited to attorneys' fees *related to the cost of re-renting*. For example, under the lease in this case, if defendants had to bring eviction proceedings against plaintiffs for

breach of the lease, this narrow provision would not allow them to recover attorneys' fees. *See Kips Bay Towers Assocs. v. Yuceoglu*, 520 N.Y.S.2d 754, 756 (N.Y. App. Div. 1987) ("Since the landlord would not have been able to recover counsel fees under paragraph 19 of the lease, the tenant cannot recover them under Real Prop. Law § 234."), *appeal denied*, 525 N.E.2d 754 (N.Y. 1988). The statute is designed to address situations where the landlord would be able to recover fees for lawsuits brought to address a breach by a tenant, in order to permit tenants to have the reciprocal ability to recover attorneys' fees where they successfully defend against the landlord's action or bring a separate action based upon the landlord's breach of the lease agreement. There is no indication that N.Y. Real Prop. Law § 234 was intended to provide for the disproportionate fee-shifting the plaintiffs' advocate, by which a landlord who provided in the lease for a tenant to pay the ordinary costs of re-renting would be therefore liable for the tenant's attorney's fees in an action based upon the landlord's failure to perform required covenants under the lease. *Gottlieb v. Such*, 740 N.Y.S.2d 44, 45 (N.Y. App. Div. 2002) ("In view of the public policy obliging the respective parties to bear the cost of counsel, a provision for recovery of fees that are 'incidents of litigation' should be construed strictly.") (citations omitted). Therefore, plaintiffs' motion for attorneys' fees pursuant to N.Y. Real Prop. Law § 234 is denied.

## C. Plaintiffs' Rule 59(a) Motion for a New Trial as to Rent Abatement Damages

Plaintiffs move for a new trial under Rule 59(a) as to rent abatement damages, charging that "[t]he jury's failure to award damages in the form of a rent abatement constitutes error as a matter of law, the award deviates

materially from what would be reasonable compensation in the form of an abatement, and the award is so limited in the fact of overwhelming evidence as to constitute a miscarriage of justice."[10]  (Pls.' Br., at 9.) Rule 59(a) provides that a court may grant a new trial in a jury case for any of the reasons "for which new trials have heretofore been granted in the courts of the United States." Fed. R. Civ. P. 59(a). "A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (citations omitted). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp.*, 163 F.3d at 134 (citing *Song v. Ives Labs.*, 957 F.2d 1041, 1047 (2d Cir. 1992)). However, "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998) (internal citation omitted)).

"A federal court, in reviewing the amount

---

[10]To the extent that plaintiffs allege an inconsistency in the verdict between the findings on liability and damages, such claim has been waived by plaintiffs' failure to raise this issue before the jury was discharged. *DiBella v. Hopkins*, 403 F.3d 102, 117 (2d Cir.), *cert. denied*, 126 S. Ct. 428 (2005) ("It is well settled that if a party does not challenge the consistency of jury verdicts while the jury is still empaneled, the objection is waived.").

of damages awarded on a state law claim, must apply New York law." *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (citing *Gasperini v. Ctr. for the Humanities*, 518 U.S. 415, 430-31 (1996) and *Cross v. N.Y. City Transit Auth.*, 417 F.3d 241, 258 (2d Cir. 2005)). "New York law provides that the appellate division 'reviewing a money judgment . . . in which it is contended that the award is excessive or inadequate . . . shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.'" *Id.* (citing N.Y. C.P.L.R. § 5501(c)). The Supreme Court has held that

> [T]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or *remittitur* should be ordered.[11]

*Gasperini*, 518 U.S., at 435 (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 279 (1989)). In *Park West Management Corp. v. Mitchell*, the New York Court of Appeals set forth the

standard for an award of rent abatement damages in cases where a breach of the warranty of habitability is found:

> [T]he proper measure of damages for breach of the warranty is the difference between the fair market value of the premises if they had been as warranted, as measured by the rent reserved under the lease, and the value of the premises during the period of the breach. . . . In ascertaining damages, the finder of fact must weigh the severity of the violation and duration of the conditions giving rise to the breach as well as the effectiveness of steps taken by the landlord to abate those conditions. Since both sides will ordinarily be intimately familiar with the conditions of the premises both before and after the breach, they are competent to give their opinion as to the diminution in value occasioned by the breach.

391 N.E.2d at 1295 (citations omitted). In accordance with *Park West*, the jurors were properly instructed that

> If you find for the plaintiffs [on the implied warranty of habitability claim], you must then determine their damages. In so doing, you must award the tenant an amount equal to the difference between the agreed rent for the premises and the reduced value of the premises during the period of time such unfitness or condition existed. In arriving at this reduced value, you may consider the type, severity and duration of such unfitness or condition.

(Ct. Ex. F.) The Court finds that the jury's

---

[11] The Supreme Court noted in *Gasperini* that the quoted holding from *Browning-Ferris* referred to punitive damages, but explained that "'[f]or purposes of deciding whether state or federal law is applicable, the question whether an award of compensatory damages exceeds what is permitted by law is not materially different from the question whether an award of punitive damages exceeds what is permitted by law." 518 U.S., at 435 n.18 (quoting *Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003, 1012 (1995)). In this instance, this Court extends the standard of review set forth in *Gasperini*, *Browning-Ferris* and *Consorti* to the instant motion regarding rent abatement damages.

verdict awarding zero rent abatement damages is not against the weight of the evidence. First, the Court credits defendants' argument that the jury "had ample basis to find that the total value of the apartment over a seven-year period . . . was equal to or greater than the total amount of rent paid during that period, notwithstanding the lead paint condition." (Defs.' Supp. Br., at 9.) According to defendants, the jury could have concluded that, because plaintiffs were paying a reduced rent, even if the value of their apartment had been diminished by the presence of lead paint, the aggregate diminished value of the apartment over the relevant period was not less than the already below-market rent paid by plaintiffs. The Court agrees. A jury could find, where plaintiffs pay a below-market rent, that the rental value of an apartment, once diminished by housing violations, may be equal to, or even greater than, the rent actually paid. In this case, a note from plaintiff expressing her gratitude to defendants that "I know that you are not charging us market rate for the house" was admitted into evidence. (Defs.' Ex. U.) Similarly, defendant Herbert Flaig testified:

> We knew [the rent] was below market rate. . . . It is an old house, things happen all the time, so we wanted to do basically below market rate so that that would be part of the deal. We also went below market rent because tenants are happier when they pay less than the market price, because we only had happy tenants. We wanted to [sic] very happy tenants again, and clearly price is part of that game. So that was why it was considerably under market rate for the triplex.

(Tr. 651.) Given this evidence, the jury could have reasonably awarded zero rent abatement because of a conclusion that the diminution in value caused by the breach was equal to plaintiffs' existing discount on the rent that would have been commanded by the market.

Second, the jury could have found that defendants were only liable for a breach of the warranty of habitability during the period from July 12, 2002 until August 2002, when plaintiffs actually moved out of the residence during repairs of the lead paint condition. Based upon the evidence presented, a jury could conclude that, plaintiffs had not proven that, prior to the testing of the apartment in July 2002, high levels of peeling, chipping, and flaking paint had caused the condition in the apartment to be problematic during the prior seven years. Under such a determination, the breach would have commenced at the time of the positive test results, and the appropriate period for an award of rent abatement would only be for the period during which plaintiffs were required to vacate. *See, e.g., Edgemont Corp. v. Audet*, 656 N.Y.S.2d 85 (N.Y. App. Div. 1996) (granting total rent abatement during period of *removal* of lead-paint hazard); *Mahlmann*, 439 N.Y.S.2d at 569 ("Generally, such abatement remains in effect for a relatively short time . . . Until the landlord repairs the breach or until the tenant vacates.") (quoting Senator Barclay, Senate, 3d Reading, June 17, 1975, pp. 7771-72). Where, as here, the parties stipulated as to plaintiffs' costs for vacating the apartment during lead testing and repairs (Tr. 499-500), the jurors may not have believed that an additional award of rent abatement for this time period was appropriate.[12]

---

[12] The parties stipulated that rent abatement was not an issue for any conduct after July 31, 2002, (Tr. 782-83; Pls.' Ex. YY), so any continuing breach of the warranty of habitability after July

Therefore, the court finds that the jury's award of zero rent abatement is not against the weight of the evidence. Plaintiffs' motion for a new trial pursuant to Rule 59(a) is denied.

### D. New Trial Under 59(d)

Following oral argument on the parties' post-trial motions, this Court considered issuing an order for a new trial, pursuant to Fed. R. Civ. P. 59(d), on the ground that the jury verdict is inconsistent as follows: (1) the jury found that defendants had breached the implied warranty of habitability, but declined to award rent abatement; (2) the jury did not find gross negligence, intentional infliction of emotional distress, intentional misrepresentation, negligent misrepresentation, or knowing violation of the RLPHRA but nevertheless found that punitive damages were warranted against both defendants; and (3) the jurors concluded that punitive damages were warranted against both defendants, but awarded punitive damages in the amount of $110,000 only as against Herbert Flaig.[13]

### 1. Standard of Review

Under Rule 59(d), a court may order a new trial on its own motion. The rule provides that

No later than 10 days after entry of judgment[14] the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion. After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion. When granting a new trial on its own initiative or for a reason not stated in a motion, the court shall specify the grounds in its order.

Fed. R. Civ. P. 59(d). A Rule 59 motion for a new trial "ordinarily should not be granted, unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 82 (2d Cir. 2006) (quoting *Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir. 1992) (internal citation omitted)).

Where, as here, special verdicts are issued pursuant to Fed. R. Civ. P. 49(a),[15] which

---

[13] An initial inconsistency on the verdict sheet related to the attribution of compensatory damages for particular claims was raised at the time of the verdict and corrected by the jury by returning to the jury room and amending the verdict sheet (without objection by the parties) and, thus, is not a basis for a new trial. (*See* Tr. 1126-52.)

[14] The Court did not enter judgment following the verdict because the parties requested additional time to obtain the trial transcript and to make the post-trial motions that are the subject of this opinion.

[15] While "there is no clear definition in [Second Circuit] caselaw of what constitutes a Rule 49(a) verdict and what constitutes a Rule 49(b) verdict," where, as here, jurors were asked to reach a legal conclusion as to liability and damages, courts within this Circuit have treated such answers as Rule 49(a) verdicts. *Denny v. Ford Motor Co.*, 42 F.3d 106, 111 (2d Cir. 1994); *see also Jarvis*, 283 F.3d at 67 (Van Graafeiland, J., dissenting) ("[T]he distinction between a Rule 49(a) verdict and one submitted under 49(b) is vague."). "For example, in *Brooks v. Brattleboro Memorial Hospital*, the district court had given a verdict form to the jury which had five questions asking

---

The first footnote (continued from previous page):

31, 2002 could not result in rent abatement damages (but could form the basis for a punitive damages award).

provides for the jury to return "only a special verdict in the form of a special written finding upon each issue of fact," because the jury's answers "provide the basis for the ultimate resolution of the suit, these 'findings must be consistent with each other.'" *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 890 (2d Cir. 1988) (citation omitted); *Kosmynka*, 462 F.3d at 82 ("When a jury returns a verdict by means of answers to special interrogatories, the findings must be consistent with one another, as they form the basis for the ultimate resolution of the action.") (citing *Crockett*, 65 F.3d at 278). "Though the Rule itself does not give guidance as to the proper course of action when the answers returned by the jury are inconsistent with one another, it is plain that proper deference to the parties' Seventh Amendment rights to a jury trial precludes entry of a judgment that disregards any material jury finding." *Id.* (collecting cases).

"Seemingly inconsistent verdicts should be reconciled if possible." *Stephenson v. Doe*, 332 F.3d 68, 78 (2d Cir. 2003) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 74-75 (2d Cir. 2001) and *Finnegan v. Fountain*, 915 F.2d 817, 820 (2d Cir. 1990)). "[I]f there is any way to view a case that makes the jury's answers to the special verdict form consistent with one another, the court must resolve the answers that way even if the interpretation is strained." *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1311 (2d Cir. 1993). "Where the special verdict answers appear to be inconsistent but there is a view of the case that makes the jury's answers consistent, they must be resolved that way." *Tolbert*, 242 F.3d at 74. However, if 'the jury's answers cannot be harmonized rationally, the judgment must be vacated and a new trial ordered.'" *Brooks*, 958 F.2d at 530-31; *see also Stephenson*, 332 F.3d at 79 ("If we are 'unable to harmonize the jury's findings, we must vacate the judgment and order a new trial.'") (quoting *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 598 (2d Cir. 2001) and citing *Tolbert*, 242 F.3d at 74). "Before a court may set aside a special verdict as inconsistent and remand the case for a new trial, it must make every attempt 'to reconcile the jury's findings, by exegesis if necessary.'" *Turley v. Police Dep't of the City of N.Y.*, 167 F.3d 757, 760 (2d Cir. 1999) (quoting *Gallick v. Baltimore & Ohio R.R.*, 372 U.S. 108, 119 (1963)) (additional citations omitted). The Court now considers whether the instant jury verdict can be reconciled.[16]

---

for a legal conclusion as to various liability claims and a sixth question as to the amount of damages. Although the form contained no strictly factual questions, [the Second Circuit] described it as a Rule 49(a) verdict." *Id.* (citing *Brooks*, 958 F.2d at 527-29); *see also Crockett v. Long Island R.R.*, 65 F.3d 274, 278 (2d Cir. 1995) (holding jury's inconsistent findings on liability and damages to be special interrogatories under Rule 49(a)); *Davis v. Becker & Assocs., Inc.*, 608 F.2d 621, 622 (5th Cir. 1979) (same); *but see Jarvis*, 283 F.3d at 56 (holding that Rule 49(a) does not apply where "the jury is required to make determinations not only of issues of fact but of ultimate liability") (citing *Lavoie*, 975 F.2d at 54). Based upon the principles set forth in *Brooks* and *Denny*, this Court shall treat the instant verdict sheet as a Rule 49(a) verdict.

---

[16] Defendants contend that plaintiffs have waived any objection to the verdict on grounds of inconsistency due to their failure to raise such objection before the jury was discharged. (Defs.' Supp. Br., at 2-3) (citing *DiBella*, 403 F.3d at 117 ("It is well settled that if a party does not challenge the consistency of jury verdicts while the jury is still empaneled, the objection is waived."). Generally, where a party fails to object to an inconsistent verdict before the jury is discharged, the objection is waived, under the

## 2. Inconsistency of the Verdict

### a. Rent Abatement Damages

For the reasons set forth at Section II.C, the Court declines to find that the jury's award of zero rent abatement damages is inconsistent with its finding for plaintiffs as to the breach of the implied warranty of habitability claim.

---

principle that courts should discourage "possible misuse of Rule 49 procedures . . . by parties anxious to implant a ground for appeal should the jury's opinion prove distasteful to them." *Haskell v. Kaman Corp.*, 743 F.2d 113, 123 (2d Cir. 1984) (quoting *Skillin v. Kimball*, 643 F.2d 19, 19-20 (1st Cir. 1981)) (additional citations omitted); *see also Jarvis*, 283 F.3d at 67 (Van Graafeiland, J., dissenting) ("[R]esubmission to the jury might cure the inconsistency, and courts want to discourage a litigant's tactical misuse of Rule 49 to secure a new trial."). However, Second Circuit precedent indicates that, under certain circumstances, where an objection to an inconsistent verdict has not been raised before the discharge of the jury, a district court may nevertheless order a new trial on grounds of inconsistency. In *Denny v. Ford Motor Co.*, the Second Circuit concluded that, in fact, "[a] case-by-case application of the familiar principles of waiver . . . thus seems desirable under Rule 49(a)." 42 F.3d 106, 111 (2d Cir. 1994) (rejecting waiver rule where "[t]his was not a case in which an inconsistency could be resolved by resubmitting the verdict form to the jury with a request that it reconcile its answers to particular questions").

Although both parties have waived any argument as it relates to inconsistent verdicts on certain issues (discussed *supra*), the Court considered whether this was a situation where the Court should order a new trial on its own authority despite the waiver rule. However, for the reasons set forth *infra*, the Court ultimately concluded that this was not such a case.

### b. Liability and Punitive Damages

"Under New York law, a verdict is inconsistent if a jury's finding 'on one claim necessarily negates an element of another cause of action.'" *Kosmynka*, 462 F.3d at 86 (quoting *Barry v. Manglass*, 432 N.E.2d 125, 126 (N.Y. 1981)) (holding that new trial was required where jury rendered inconsistent verdict concluding that defendant was negligent, yet finding in favor of defendant on issue of strict product liability). In this instance, defendants contend that the verdict is, in fact, "wholly and logically consistent as to each and every claim" with regard to liability. (Defs.' Supp. Br., at 6.) According to defendants,

> The jury consistently found for the plaintiffs on each of their 'unintentional claims (negligence and breach of warranty of habitability) and consistently against them on each of their claims for knowing, intentional or aggravated conduct (gross negligence, misrepresentation, knowing violation of RLPHRA, intentional infliction of emotional distress etc.). These were also consistent as to both plaintiffs and as to both defendants. The jury clearly drew a line, rationally so, between unintentional and intentional conduct in determining liability, across seven claims. . . . [H]ere the jury's verdict is rock solid on *liability*, in each instance.

(Defs.' Br., at 7.) The Court agrees with defendants' interpretation and finds, moreover, that the award of punitive damages is not inconsistent with the jury's findings as to liability. As set forth *supra*, New York courts have consistently awarded punitive

damages for particularly egregious breaches of the warranty of habitability, and thus there is no conflict between the jury's findings as to liability and the punitive damages award in this case.[17] Although the jury found no liability for gross negligence or the intentional tort claims, they could have found egregious conduct under the warranty of habitability not specifically encompassed within the elements of those claims.[18]

### b. Award of Punitive Damages Against Only One Defendant

Defendants also contend that the award of punitive damages against defendant Herbert Flaig, but not against defendant Marilyn Flaig, was not inconsistent because "it remained in the jury's province to award no punitive damages" and "[t]he jury's verdict for zero punitive damages against Marilyn Flaig was an exercise of that perogative." (Defs.' Supp. Br., at 10.) Defendants aver, moreover, that "Mrs. Flaig's minimal involvement gave essentially no basis for punitive damages."[19]

---

[17] Similarly, under plaintiffs' interpretation of the verdict, the jury found "willful" breach of the warranty of habitability as well as "reckless and wanton indifference to the rights of the plaintiffs" sufficient to support punitive damages. (Pls.' Supp. Reply Br., at 5.)

[18] In any event, as noted *supra*, any inconsistency regarding this issue has been waived because it was not raised at the time of the verdict. *See* n.6.

[19] Although the jury initially concluded that punitive damages were warranted against Marilyn Flaig, they were not given an instruction regarding the factors for calculating such damages (pursuant to agreement of the parties) until after making that finding. After the jury's verdict as to liability was returned, they were instructed, in part, as follows:

In arriving at your decision as to the

---

(*Id.* at 10-11.) "New York favors individual assessment of punitive damages," *McFadden v. Sanchez*, 710 F.2d 907, 914 (2d Cir. 1983), and in this instance, the jurors' conclusion that Herbert Flaig was primarily culpable for the breach of the warranty of habitability was not against the weight of the evidence.

### E. Defendants' Rule 59 Motion for *Remittitur* of the Punitive Damages Award

Defendants argue that the jury's award of $110,000 in punitive damages, in light of the award of $5,268.01 in compensatory damages, was so excessive as to be unconstitutional. Thus, according to defendants, this Court should order *remittitur* of the punitive damages award pursuant to Fed. R. Civ. P. 59. For the reasons that follow, this Court grants defendants' motion and orders that the award must be reduced to $50,000 or, in the alternative, a new trial on punitive damages must be ordered.

---

amount of punitive damages you should consider the following factors:
1. The nature and reprehensibility of what the defendant did. That would include the character of the wrongdoing, whether the defendants' conduct demonstrated an indifference to, or a reckless disregard of, the health and safety of others, how long the conduct went on, the defendants' awareness of what harm the conduct caused or was likely to cause, and any concealment or covering up of the wrongdoing. In considering the amount of punitive damages to award, you should weigh this factor heavily.

(Ct. Ex. 8.) Once the jury received this additional instruction (which did not provide specific direction as to relative culpability), they could have rationally concluded that no punitive damages were appropriate as to Marilyn Flaig.

When reviewing a motion for *remittitur* under Rule 59 in a diversity case, a federal district court should apply federal procedural standards and state substantive law. *See Imbrogno v. Chamberlain*, 89 F.3d 87, 90 (2d Cir.1996); *Gasperini*, 518 U.S. at 418. As to New York State substantive law regarding punitive damages, Judge Sotomayor, sitting by designation in the Southern District of New York, observed:

> "[T]he amount of exemplary damages awarded by a jury should not be reduced by a court unless it is so grossly excessive 'as to show by its very exorbitancy that it was actuated by passion.'" [*Nardelli v. Stamberg*, 44 N.Y.2d 500, 503 (1978).] (quoting 1 Clark, *New York Law of Damages*, § 56, p. 102; *accord* Restatement Torts, Comment d, § 908; 14 N.Y.Jur., Damages § 188; *see also id.* (punitive damage award are "not lightly to be disturbed."). In determining whether an award is grossly excessive in this sense, courts have been instructed to examine whether the punitive damages are "reasonably related to the harm done and the flagrancy of the conduct." *See, e.g., Liberman v. Riverside Memorial Chapel, Inc.*, 650 N.Y.S.2d 194 (1st Dep't 1996); *Suffolk Sports Ctr., Inc., v. Belli Constr. Corp.*, 664 N.Y.S.2d 724 (2d Dep't 1997).

*Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 267 (S.D.N.Y. 1999).

Moreover, the Due Process Clause of the Fourteenth Amendment prohibits "grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Aut. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *In re Simon II Litig.*, 407 F.3d 125, 135 (2d Cir. 2006). A punitive damages award is excessive under the Constitution if it "is so high as to shock the judicial conscience and constitute a denial of justice."[20] *DiSorbo v. Hoy*, 343 F.3d 172, 186 (2d Cir. 2003) (internal citation and quotation marks omitted). The Supreme Court requires courts reviewing the reasonableness of punitive damages to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Considering these guideposts, and applying the state law standard, the Court finds that the punitive award in this case is grossly excessive and must be reduced.

### 1. Reprehensibility of Defendants' Misconduct

As the Supreme Court observed, "'the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.'" *Id.* at 419 (quoting *Gore*, 517 U.S. at 575); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39,

---

[20] The Court notes that the Supreme Court recently has addressed the Constitution's procedural limitations on punitive damages awards. *See Phillip Morris USA v. Williams*, 127 S.Ct. 1057, 1062 (2007). However, in the instant case, the parties debate a separate issue – that is, whether the award exceeds substantive limitations on punitive damages awards – which the Supreme Court expressly declined to consider in *Phillip Morris*. *See id.* at 1062.

63 (2d Cir. 2004). In weighing the degree of reprehensibility of the wrongful act, reviewing courts must consider whether:

> [T]he harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419.

Here, as discussed *supra,* there was evidence in the record from which the jury could conclude that, although it did not result in a large amount of compensatory damages, the degree of reprehensibility of defendants' conduct was substantial. Yet, the Court also notes that the jury found *for defendants* as to plaintiffs' claims of gross negligence, IIED, intentional misrepresentation, and negligent misrepresentation. Thus, the jury appears to have found that defendants' conduct in connection with the breach of the warranty of habitability was sufficiently egregious so as to warrant punitive damages, even though such conduct did not separately support liability on these other claims. However, the Court does not believe that the evidence in the record, with regard to (1) the type of harm actually inflicted on plaintiffs (as opposed to the type of harm they believe their daughter may have suffered), or (2) the nature of defendants' conduct, would support the $110,000 awarded in this case. For the same reasons, the Court finds that, under New York law, the punitive damages award in this case is not reasonably related to the harm done and the flagrancy of defendants' conduct.

### 2. Disparity Between Actual or Potential Harm and Punitive Damages Award

As to the second guidepost, the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *Campbell*, 538 U.S. at 410; *see Gore*, 517 U.S. at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award.") (emphasis omitted). However, significantly, the Court has held that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425 (finding a presumption against a 145 to 1 ratio); *see also Pacific Mut. Life Ins. v. Haslip*, 499 U.S. 1, 23-24 (1991) (holding that a 4 to 1 ratio might be "close to the line" of constitutional impropriety). Although the Supreme Court has stressed that these precedents have not established a *per se* rule, *see Campbell*, 538 U.S. at 425, the Second Circuit has added that ratios exceeding "single-digit multipliers" are considered appropriate only "where the plaintiff receives an insignificant or nominal compensatory award." *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 126 (2d Cir. 2004).

Here, the jury's award constituted a ratio of over 20:1 – far exceeding the single-digit multiplier approvingly cited as the guidepost for a constitutionally permissible award in *Campbell. See* 538 U.S. at 425. The Court finds that the ratio in this case is grossly excessive under state law and the Constitution. The instant case does not present one of the few scenarios where courts

have acknowledged that ratios in excess of single-digit multipliers may still comport with the requirements of due process. That is, this case does not present an exceptional circumstance where a "particularly egregious act has resulted in only a small amount of economic damages" or where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Campbell*, 538 U.S. at 425 (quoting *Gore*, 517 U.S. at 582) (internal quotation marks omitted). Instead, as discussed above, defendants' conduct, although found by the jury to be reprehensible, cannot be characterized as a particularly egregious situation that warrants gross deviation from the ratios set forth in Supreme Court jurisprudence. Moreover, the evidence produced at trial does not support an award of damages for noneconomic harm as to the plaintiffs that might be difficult to detect or to determine. For these reasons, the Court finds that the damages ratio in this case is grossly excessive and must be reduced to comport with the constitutional guideposts established by the Supreme Court as well as the dictates of New York law. As such, the conditional *remittitur* in this case would reduce the punitive award to $50,000 and maintain the compensatory award of $5268.01, which would constitute a 9.49:1 ratio.

### 3. Disparity Between Punitive Damages and Civil Penalties in Comparable Cases

This final factor requires a comparison to awards authorized in similar cases. The punitive damages awarded here far exceed those approved in cases involving similar and, in some instances, more egregious examples of misconduct than that demonstrated by defendants. *See, e.g., Minjak Co.*, 528 N.Y.S.2d at 556-58 (affirming $5,000 punitive award for breach of warranty of habitability where landlord engaged in "dangerous" construction while tenants remained in building, evincing "the landlord's indifference to the health and safety of others, and its disregard for the rights of others, so as to imply even a criminal indifference to civil obligations"); *Benitez*, 641 N.Y.S.2d at 526 (awarding $500 in punitive damages for breach of warranty where landlord "did nothing to remove [a] problem tenant and protect the plaintiff and other tenants" from flooding caused by the problem tenant); *Smithline v. Monica*, 1987 WL 14296, at *19 (N.Y. City Ct. 1987) (awarding $10,000 in punitive damages for breach of warranty where landlord failed to address problems relating to the provision of heat, cockroach infestation, and other maintenance issues) (collecting cases); *Pleasant E. Assoc.*, 480 N.Y.S.2d at 697 (N.Y. Civ. Ct. 1984) (awarding $1,000 in punitive damages for breach of warranty where landlord failed "to service the apartment . . . with the clear intent to cause . . . the tenants to vacate the apartment"); *see also Gruber v. Craig*, 618 N.Y.S.2d 84, 85 (N.Y. App. Div. 1994) (affirming $25,000 punitive award in negligence action where landlord failed to repair leaking gas pipe, which resulted in an explosion that injured plaintiff).[21] As such, the Court finds that reducing the award to $50,000 would align it with the awards given in comparable cases and thus ensure that the award is no longer grossly excessive when viewed in relation to every comparable case that has been brought to this Court's attention or uncovered by this Court's own research.

---

[21] The Court notes that the cited cases predate the instant case by many years, and, as such, the Court does not rely on the amounts given in those cases as imposing rigid guidelines on the proper amount to be awarded here.

In sum, because the punitive damages award in this case is not reasonably related to the harm done and the flagrancy, the Court finds that it is grossly excessive under the applicable standards pursuant to New York State law and the United States Constitution. Thus, the punitive damages award is conditionally remitted to $50,000. "If plaintiffs do not accept the *remittitur*, the [Court] shall vacate the punitive damage award and retry . . . the punitive damage issue." *Celle v. Filipino*, 209 F.3d 163, 191 (2d Cir. 2000) (citing *Hetzel v. Prince William Cty.*, 523 U.S. 208, 211-12 (1998) (finding that the Court of Appeals' order "requiring the District Court to enter judgment for a lesser amount than that determined by the jury without allowing petitioner the option of a new trial, cannot be squared with the Seventh Amendment").

### III. CONCLUSION

For the foregoing reasons, plaintiffs' motions for judgment as a matter of law as to the RLPHRA claim is DENIED. Plaintiffs' motions for treble damages and attorneys' fees under the RLPHRA and for attorneys' fees under N.Y. Real Prop. Law § 234 is DENIED. Plaintiffs' motion for a new trial regarding rent abatement damages is DENIED. Defendants' motion for judgment as a matter of law notwithstanding the verdict is DENIED. Defendants' motion for *remittitur* of the punitive damages award is GRANTED. Plaintiffs have until April 23, 2007, to accept the *remittitur*, or the Court shall vacate the punitive damages award and order a new trial on the punitive damages issue.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 31, 2007
Central Islip, New York

\* \* \*

The attorney for the plaintiffs is Mark H. Bierman, Esq., of Beranbaum, Menken, Ben-Asher & Bierman, LLP, 80 Pine Street, 32nd Floor, New York, New York 10005. The attorneys for the defendants are Robert J. Conway, Esq., and Steven L. Sonkin, Esq., of Marshall, Conway & Wright, 116 John Street, 4th Floor, New York, New York 10038 and Andrew P. Saulitis, Esq., 555 Madison Avenue, New York, New York 10022-3301.